IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN JONES, | ) | Case No. 1:24-cv-1353 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Shawn Jones ("Jones"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards to reach a conclusion supported by substantial evidence, I recommend that the Commissioner's final decision denying Jones's application for DIB be vacated and that his case be remanded for further consideration.

## II.     Procedural History

Jones filed for DIB on July 19, 2022, alleging a disability onset date of April 1, 2022. (Tr. 308-09). The claim was denied initially and on reconsideration. (Tr. 168-71, 179-82). He then requested a hearing before an ALJ. (Tr. 183-84). Jones (represented by counsel) and a vocational expert ("VE") testified before the ALJ on August 3, 2023. (Tr. 48-85). On August 16, 2023, the

1

ALJ issued his first written decision finding Jones not disabled. (Tr. 134-59). Jones appealed (Tr. 233-34), and the Appeals Council remanded the matter for further hearing and decision, (Tr. 160-67).

The ALJ held a second hearing on April 11, 2024. (Tr. 84-112). He issued another decision on April 19, 2024, again finding Jones not disabled. (Tr. 14-42). The Appeals Council denied his request for review on June 13, 2024, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Jones timely filed this action on August 8, 2024. (ECF Doc. 1).

III.    **Evidence**

    A.    **Personal, Educational, and Vocational Evidence**

Jones  was 46 years old on the alleged onset date, making him a younger individual according to Agency regulations.[1] (*See* Tr. 40). He graduated from high school. (*See id.*). In the past, he worked as a floor waxer. (*Id.*).

    B.    **Relevant Medical Evidence**

On December 8, 2021, before the alleged onset date, Jones presented to the emergency department complaining of pain in the bottom of his right foot. (Tr. 507). He reported a history of bone spurs but no trauma or injury. (*Id.*). On examination, he had tenderness at the plantar surface of his right foot. (Tr. 509). He sat, stood, and walked with a cane. (*Id.*). He was seen by podiatry and assessed with plantar fasciitis. (*Id.*). He had foot inserts and was given ibuprofen for the short term, with instruction to follow up with his PCP and podiatry. (*Id.*).

---

[1] The ALJ's decision also finds that Jones "subsequently changed age category to closely approaching advanced age." (Tr. 40). Yet this portion of the finding is in error; Jones had just turned 49 in the days prior to the ALJ's decision. (*See id*; *see also* ECF Doc. 6, p. 3 n.2). Jones therefore remained a younger individual during the relevant period. *See* 20 C.F.R. 404.1563.

On December 10, 2021, Jones attended physical therapy for his plantar fasciitis and bilateral heel pain with impaired coordination. (Tr. 505). The physical therapist observed Jones had a modified independent gait with a standard cane. (*Id.*). Jones reported intermittent shooting pain and that he did not notice any better flexibility in his ankles from previous physical therapy appointments. (*Id.*).

On December 14, 2021, Jones attended an appointment at the VA podiatry clinic with Eric Beaujon, D.P.M., and Jeffrey Whitaker, D.P.M., complaining of unimproved bilateral plantar fasciitis, right greater than left. (Tr. 503). Jones reported he attempted home stretches daily, physical therapy, powersteps braces, Medrol dosepack, and customs foot orthotics, without relief. (*Id.*). He believed the orthotics had worn out and he needed new ones. (*Id.*). He reported frustration with the lack of improvement in his pain, and that his pain was 7/10. (*Id.*). Jones had been working full time at the VA, but he needed to cut back to part-time work because he could not be on his feet long enough to work all day. (*Id.*). On examination, Jones had pain to palpation of the medial calcaneal tubercle and medial band of the plantar fascia bilaterally, right greater than left. (Tr. 504). He received a steroid injection in his right plantar fascia but declined the left. (Tr. 505). An order was placed for custom orthotics and Jones was given an ankle sleeve with heel cushions. (*Id.*). Jones was recommended to continue his daily stretching and to return to the podiatry clinic in three months. (*Id.*).

After the alleged onset date, on April 7, 2022, Jones met with Anthony Battaglia, D.C., complaining of an acute flare-up of his mid and low back pain. (Tr. 467). He rated his pain at 6/10. (*Id.*). He had pain to palpation in his thoracic and lumbar spine, muscle spasms, and was positive for myofascial trigger points. (*Id.*). Dr. Battaglia assessed Jones with lumbar spondylosis and pain in his thoracic spine and provided chiropractic care. (*Id.*).

X-ray results of Jones's lumbar spine from June 14, 2022, revealed "probable slight left convex curvature of the lumbar spine which appears grossly unchanged or slightly more prominent" when compared to the prior study from December 9, 2014. (Tr. 626). Small marginal osteophytes were arising from L3, L4, and L5 vertebral bodies, with mild L5-S1 disc space narrowing. (*Id.*). The impression showed no evidence of acute displaced fracture or subluxation but did show mild degenerative disease of the lumbar spine. (*Id.*). An x-ray of Jones's right knee taken the same day noted no evidence of acute displaced fracture or dislocation and confirmed mild degenerative changes. (Tr. 626-27).

Jones followed up with Dr. Battaglia on July 11, 2022, for treatment of his low back pain, chronic right knee pain, and bilateral foot and ankle pain. (Tr. 443). On examination, Jones, had decreased lumbar range of motion of flexion 60 degrees with pain and extension 15 degrees with pain; he had also limited range of motion of the right knee with pain, increased pain on flexion, and tenderness with palpation of medial aspect of right knee with noted swelling. (*Id.*). He also had positive Kemp's sign, but his straight leg raise test was negative and his heel/toe walk was within normal limits. (*Id.*). Dr. Battaglia recommended Jones continue with his home exercise plan and return in four weeks. (Tr. 444).

On September 13, 2022, Jones attended the podiatry clinic with Dr. Whittaker, who debrided an ingrown toenail. (Tr. 669, 673). He presented to the clinic in high ankle athletic shoes with power step inserts and was ambulating with help from a cane. (Tr. 672). Dr. Whittaker dispensed heel lifts and Achilles protective sleeves. (*Id.*). Jones was recommended to follow up in three months. (Tr. 673). At follow up on December 30, 2022, Jones received new shoes and orthotics for his Haglund's deformity heel spurs. (Tr. 795).

4

On March 16, 2023, Jones followed up with the podiatry clinic for his bilateral plantar fasciitis and Haglund's deformities. (Tr. 845). He reported performing his stretches twice weekly and before getting out of bed and receiving the most relief from his custom inserts and shoes. (*Id.*). He was also using his night splint at six-to-seven-minute intervals while sitting at his desk. (*Id.*). He rated his pain at 4/10 and declined a left plantar fascial injection. (*Id.*). On examination, Jones presented ambulating with help from a cane and was wearing boots with custom inserts and Achilles sleeves. (Tr. 847). Dr. Whittaker recommended Jones continue with his exercises, dispensed additional Achilles sleeves, and recommended follow up with the podiatry clinic as needed. (Tr. 848).

On April 21, 2023, Jones followed up with Dr. Battaglia, complaining of low back pain at 3/10. (Tr. 836). Dr. Battaglia ordered a cane. (Tr. 837). Jones received chiropractic treatment and was recommended to follow up in four to five weeks. (*Id.*). At follow up on June 10, 2023, Jones reported increased low back pain at 6/10. (Tr. 895). Dr. Battaglia provided chiropractic treatment and recommended follow up in four to five weeks. (Tr. 896). Jones reported improved low back pain of 3/10 on June 15, 2023. (Tr. 881-82).

On June 27, 2023, Jones presented to the emergency department complaining of right lateral elbow pain, worsened with grasping or wrist extension. (Tr. 952). He was assessed with right lateral epicondylitis and provided a tennis elbow strap. (*Id.*). He was discharged with instructions to ice, rest, and take Tylenol. (*Id.*). At a primary care visit on July 27, 2023, Jones reported he was wearing the tennis elbow brace "almost all the time." (Tr. 1076). He also reported having issues with grip and tingling in the fourth and fifth fingers of his right hand. (*Id.*). He also reported continued foot pain. (Tr. 1077). Jones was recommended to continue wearing the elbow brace as needed and to follow up if his neuropathy worsened; he was also

5

recommended to continue using his orthotic and taking Tylenol as needed for pain, and to follow up with the podiatry clinic. (Tr. 1078).

On July 11, 2023, Jones underwent a functional assessment of his activities of daily living with the VA. (Tr. 935). He reported being able to feed himself and brush his teeth with his non-dominant (left) hand because of the issues with his right elbow. (Tr. 935-36). He reported using a shower chair and having trouble cleaning himself because of pain in his lower extremities and his right elbow issue. (Tr. 936). He generally could clean himself after toileting, but sometimes required assistance during a "'flare up.'" (Tr. 937). Jones used compression garments on his right forearm and bilateral feet. (*Id.*). His mobility was limited; he was ambulatory using a single point cane up to 50 feet. (Tr. 938-39). However, he reported being unable to walk for 15 minutes, could not pick up and carry objects, nor could he finish walking across a street before the light turns red. (*Id.*).

On September 11, 2023, Jones attended a physical therapy consult with Ryan Kasper, referred by Dr. Whittaker for treatment of his bilateral plantar fasciitis. (Tr. 1053). Jones reported a remote foot injury while in deployment that worsened in 2017. (Tr. 1054). He quit working at the VA in 2022 because he could not work consistently six to eight hours per day. (*Id.*). He reported relief from pain with inserts, ice, rubbing, and rest. (*Id.*). He had taken Advil before the physical therapy appointment and reported 10/10 pain. (*Id.*). Jones reported using a single point cane for the past four years and was able to walk for about 20 minutes before needing to stop from pain. (Tr. 1055). Mr. Kasper noted Jones had decreased bilateral lower extremity strength, range of motion, and static balance. (Tr. 1057). Jones also had pes cavus bilaterally, increased pain along bilateral plantar fascia, and abnormalities with gait without shoes requiring a single point cane with ambulation. (*Id.*). As a result, Jones had a decreased functional level resulting in

decreased quality of life. (*Id.*). Mr. Kasper recommended physical therapy once weekly for six to eight sessions. (Tr. 1058).

At his physical therapy session on September 18, 2023, Jones reported compliance with his home exercise program two or three times per day. (Tr. 1051). He arrived complaining of pain 10/10 in his bilateral feet and sciatic pain traveling down the posterior aspect of the right lower extremity to the foot. (*Id.*). Mr. Kasper provided a TENS trial with activity, and Jones reported improved pain of 5/10 by the end of the session. (*Id.*).

On September 19, 2023, Jones attended a chiropractic visit with Dr. Battaglia complaining of an acute flare-up of his low back pain and spondylosis. (Tr. 1049-50). Jones rated his pain as a 6/10. (Tr. 1049). Dr. Battaglia provided chiropractic care and recommended Jones return as needed. (Tr. 1050).

On September 27, 2023, Jones attended a physical therapy appointment and reported about three days' improvement in pain after the last session. (Tr. 1046). His pain, when improved, was 4/10, but returned to 10/10. (*Id.*).

At the October 11, 2023, physical therapy appointment, Jones reported some improvement in his walking a day or two following TENS unit use. (Tr. 1044). He reported continued compliance with his home exercise program, but no improvement in pain, which he rated at 10/10. (*Id.*).

On January 4, 2024, Jones presented to Dr. Battaglia for chiropractic follow up. (Tr. 1116-17). He reported low back pain, bilateral hip pain, headache, and neck stiffness, with the pain rated at 3/10. (Tr. 1116). On examination, Dr. Battaglia noted reduced lumbar range of motion most noticeable on extension, positive Kemp's and FABER testing, and positive Tinel's right elbow. (Tr. 1117). Dr. Battaglia provided chiropractic care and recommended follow up in

two weeks. (*Id.*). At his February 13, 2024 appointment with Dr. Battaglia, Jones reported back

pain of 6/10 after an acute flare-up. (Tr. 1111). On March 7, 2024, Jones reported improvement

to 3/10 low back pain. (Tr. 1125).

### C. Medical Opinion Evidence

On August 21, 2022, at the initial level, state agency reviewing physician Mehr Siddiqui,

M.D. reviewed Jones's record. (Tr. 117-19). Dr. Siddiqui opined that Jones could perform light

work, lifting up to 20 pounds occasionally and up to 10 pounds frequently, but with standing and

walking limited to four hours in an eight-hour workday, occasional climbing of ramps and stairs,

and never climbing ladders, ropes or scaffolds; occasional balancing, stooping, kneeling and

crouching, but never crawling; avoiding concentrated exposure to noise or vibration, and

avoiding concentrated exposure to fumes, odors, dust, gases, and poor ventilation; and avoid all

exposure to work hazards such as unprotected heights or heavy machinery. (*Id.*). Dr. Siddiqui

supported this opinion with reference to Jones's bilateral plantar fasciitis, use of bilateral

orthotics and a cane for ambulation, and right knee osteoarthritis and lumbar spine spondylosis.

(Tr. 119).

Abraham Mikolov, M.D., reviewed the file at the reconsideration level on December 29,

2022. (Tr. 128-30). Dr. Mikolov noted that new evidence had been received since the initial

review level and reduced the assessment of Jones's ability to stand and walk from four hours per

eight-hour workday to two hours per workday. (Tr. 128). This new assessment was based on

mild degenerative disc disease in the lumbar spine and Jones's need for a cane to ambulate long

distances, and his uneven gait with the cane. (Tr. 130).

On December 27, 2022, Jones attended a consultative examination with Dorothy

Bradford, M.D. (Tr. 756). Dr. Bradford noted Jones's history as having low back pain since a

military injury in 2008, radiating down his right leg and treated with physical therapy and chiropractic care every two weeks. (*Id.*). His feet constantly hurt because of heel spurs and plantar fasciitis, which he treated with braces, pads, orthotics, and shots. (*Id.*). His right knee often gave out. (*Id.*). Jones used a cane "at all times." (*Id.*). On examination, his gait was uneven favoring the left. (Tr. 757). A straight leg test was positive on the right. (*Id.*). In Dr. Bradford's opinion, Jones had intervertebral disc disease with right sciatica and depended on a cane to ambulate long distances. (*Id.*). Comorbid conditions included heel spurs, plantar fasciitis, cluster headaches, and posttraumatic stress disorder ("PTSD"). (*Id.*).

### D. Administrative Hearing Evidence

Jones testified before the ALJ on April 11, 2024. (Tr. 90). He testified that he lived with his wife, had a driver's license, had a high school diploma, and some college education. (*Id.*). The ALJ used the same past work identified in the first hearing: floor waxer, DOT 381.687-034, medium, SVP 2, performed at medium. (Tr. 91).

Jones testified that he continued to have cluster headaches, foot problems, back pain, and he could not lift anything over 30 pounds. (Tr. 92). He would perform stretching exercises for his foot pain, and he wore a brace for heel spurs and arch support, as well as wearing "special shoes." (Tr. 92-93). He also required the use of a cane for walking long distances or during a flare-up. (Tr. 93). He needed to use the cane around the house, as his right leg would give out from something as simple as sitting on the commode; if he didn't have his cane, his wife would have to come and help him get off the commode. (*Id.*). He took his cane whenever he needed to leave the house. (*Id.*). He still needed to use his cane around the house two or three days per week, to move shorter distances from room to room. (Tr. 96). He estimated that he could only stand for 10 to 15 minutes at most before needing to sit down. (Tr. 97-98). He carried a

collapsible stool with him to accommodate his need to sit. (Tr. 98). He found it difficult to stand on his feet for any length of time; Jones described feeling pain in his feet "continuously" and would stretch his feet to keep them from locking up on him. (*Id.*). He needed to sit for twenty minutes to rest before he could return to standing. (*Id.*). If he overexerts himself, he will have to lay down for an extended period due to increased back pain. (Tr. 99-100). He can no longer do landscaping, even for himself; his brother does his yard for him. (Tr. 100-01).

Jones also described an injury to his forearms when landscaping in 2023. (Tr. 100). He now wears braces on his forearms "to help that nerve tendon from acting up." (*Id.*).

Jones took photography classes at the VA as therapy for his PTSD. (Tr. 94). He attended Lodge meetings and volunteered to feed the homeless. (Tr. 97).

The VE, Allison Reno, then testified. (Tr. 102). The ALJ presented the following hypothetical: an individual who can perform light work with additional limitations including standing and walking for up to four hours in an eight-hour workday; can only occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, and crouch, but never crawl, work at unprotected heights, or near dangerous moving machinery; no commercial driving; and can tolerate no more than frequent exposure to dusts, odors, fumes, and pulmonary irritants; can have frequent exposure to vibration and no more than loud noises in the work environment;[2] the person can adapt to only occasional and superficial interaction with supervisors, coworkers, and the public, meaning no arbitration, mediation, negotiation, or being responsible for the safety or supervision of others; and lastly, the person can adapt to only occasional and routine workplace changes. (Tr. 103). The VE responded that the hypothetical

---

[2] Although the hypothetical RFC has been provided verbatim from the transcript, it appears the limitation pertaining to loud noises may have been recorded in error.

person could not perform Jones's past work, but that they could perform the following two representative jobs at the light, unskilled level: office helper, DOT 239.567-010, SVP 2, unskilled, with 101,000 jobs in the national economy; and mail clerk, DOT 209.687-026, SVP 2, unskilled, 42,000 jobs in the national economy. (Tr. 103-04). The VE testified that she could not find a third representative job because of the limitation of reduced standing and walking to four hours, combined with the limitation of occasional and superficial interactions with others. (Tr. 104). However, she could identify a sedentary level to meet the hypothetical: circuit board assembler, DOT 726.684-110, SVP 2, unskilled, 10,000 jobs in the national economy. (Tr. 104-05).

If the individual were further limited to two hours of standing and walking, Jones's past work would be unavailable, and would also eliminate all jobs at the light, unskilled level. (Tr. 105). However, the VE testified to one additional sedentary job, including the previously identified circuit board assembler: table worker, DOT 739.687-182, SVP 2, unskilled, 10,000 jobs in the national economy. (Tr. 105). However, the VE was again unable to find a third sedentary job appropriate to the hypothetical. (*Id.*). The VE opined that she could not identify any jobs with a limitation to light based on lifting and carrying but permitting only two hours of standing and walking. (Tr. 106-07).

The ALJ also built on the first light exertional hypothetical but included that the individual would require a cane for ambulation. (Tr. 107). In response, the VE opined that the cane limitation "would eliminate all jobs at the light, unskilled level." (*Id.*). However, an individual with a cane restriction could perform the identified sedentary jobs of circuit board assembler and table worker, and the number of jobs in the national economy would remain the same. (Tr. 107-08).

The VE also testified that, in her experience, an individual who is off-task 15 percent or more during an eight-hour workday outside of standard breaks, would be work preclusive. (Tr. 108). Likewise, an employer would tolerate one to two absences in a 30- to 60-day probationary period, but even one absence per month on a consistent basis would result in termination. (*Id.*).

In response to counsel's questioning, the VE clarified that an additional limitation that the hypothetical person could not work in any job that required a fast pace or production rate quota would not affect the jobs identified in response to the first and second hypotheticals. (Tr. 108-09). A limitation to no contact with the public would not affect the light jobs of mail clerk and office helper. (Tr. 109-10). And if there were a limitation to only little changes in job duties and any changes would be implemented gradually over time would not change jobs at the light or sedentary level. (Tr. 110). A need for two additional 15-minute breaks outside the usual schedule to lay down and alleviate symptoms would preclude all competitive employment. (*Id.*). If a person needed to alternate between sitting and standing every 20 minutes, that would not be work preclusive; but it would be work preclusive if the individual could only remain in one position for less than 20 minutes at a time. (Tr. 110-11).

## IV.    The ALJ's Decision

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2027.

2.    The claimant has not engaged in substantial gainful activity since April 1, 2022, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: plantar fasciitis, right knee osteoarthritis, lumbar spondylosis, headaches, and post-traumatic stress disorder ("PTSD") (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He can sit for 6 hours in an 8-hour workday. He can stand and/or walk for 4 hours in an 8-hour workday. He can push and pull within the lifting and carrying limitations. He requires the use of a cane for ambulation. He can climb ramps and stairs occasionally. He can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, and crouch. He can never crawl. Tolerate no more than frequently, dust, odors, fumes and pulmonary irritants, vibration, or loud noises; He can never work at unprotected heights, around dangerous moving machinery, or perform commercial driving. He can adapt to occasional and superficial interaction with supervisors, coworkers, and the public. Superficial is defined as no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others. He can adapt to occasional routine workplace changes.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on April 14, 1975 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2022, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 20-42).

## V.    Law & Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.    whether the claimant is engaged in substantial gainful activity;

2.    if not, whether the claimant has a severe impairment or combination of impairments;

3.    if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.    if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.    if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the

14

conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

**VI.     Discussion**

Jones brings one issue for this Court's review: "Whether the Administrative Law Judge misinterpreted or became confused with vocational expert testimony, and then found Plaintiff capable of work when the vocational expert's testimony stated no jobs were available." (ECF Doc. 6, p. 1). Jones asserts that the ALJ erred in relying on the VE's testimony at Step Five to find that jobs were available based on the RFC crafted for Jones, which included use of a cane. (*Id.* at pp. 19-23). In any event, the VE testimony cannot support the ALJ's Step Five findings, because the VE testified that no jobs were available for an individual limited to light work who needed a cane. (*Id.*, citing to Tr. 103-08).

The Commissioner does not directly address this clear error in her brief. Rather, she asserts that remand is not required because the VE testified that other jobs – jobs not relied on by the ALJ in his decision, nor responsive to Jones's RFC – were available in the national economy for a person who was limited to sedentary work and needed to use a cane. (ECF Doc. 8, pp. 4-6).

My recommendation here is that remand is warranted. The VE testified that no light jobs would be available should an individual require the use of a cane. (Tr. 107). Nonetheless, the ALJ crafted a light RFC that included the use of a cane and relied on VE testimony that found jobs for an RFC without the use of a cane. (*Compare* Tr. 103-07 (hearing testimony) *with* Tr. 27-41 (ALJ decision)).

At Step Five, the burden shifts to the Commissioner to produce evidence to show the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 404.1520(a)(4)(v). An ALJ may determine that a claimant can adjust to other work in the national economy by relying on a VE's testimony that the claimant can perform specific jobs. *O'Neal v. Comm'r of Soc. Sec.*, 799 F.

App'x 313, 316 (6th Cir. 2020). The ALJ can rely on a VE's expertise to determine what constitutes a "significant number" of jobs in the national economy, as supported by reliance on job descriptions found in the Dictionary of Occupational Titles ("DOT"). *O'Neal*, 799 F. App'x at 316-18 (explaining that the ALJ can rely on VE testimony and the DOT to establish that work exists in the national economy) (collecting cases). But VE testimony in response to a hypothetical question is substantial evidence only when the question accurately portrays the claimant's RFC and other vocational characteristics. *Id.*; *see also Howard*, 276 F.3d at 238.

Here, substantial evidence does not support the ALJ's Step Five determination. The physical RFC determination provided, in relevant part, that Jones:

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He can sit for 6 hours in an 8-hour workday. He can stand and/or walk for 4 hours in an 8-hour workday. He can push and pull within the lifting and carrying limitations. He requires the use of a cane for ambulation.

(Tr. 27). The ALJ then explained at Step Five:

> To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as office helper (239.567-010, and 101,000 jobs nationally) and mail clerk (209.687-026, and 42,000 jobs nationally).

(Tr. 41). However, the VE did not testify during the hearing that a person with Jones's RFC could perform the representative jobs of office helper and mail clerk. (*Compare* Tr. 27 *and* Tr. 41 *with* Tr. 103-04, 107). I provide these excerpts from the administrative hearing:

The ALJ presented the first hypothetical as follows: an individual who can perform light work with additional limitations including standing and walking for up to four hours in an eight-hour workday; can only occasionally climb ramps and stairs; never climb ladders, ropes, or

scaffolds; can occasionally balance, stoop, kneel, and crouch, but never crawl, work at unprotected heights, or near dangerous moving machinery; no commercial driving; and can tolerate no more than frequent exposure to dusts, odors, fumes, and pulmonary irritants; can have frequent exposure to vibration and no more than loud noises in the work environment;  the person can adapt to only occasional and superficial interaction with supervisors, coworkers, and the public, meaning no arbitration, mediation, negotiation, or being responsible for the safety or supervision of others; and lastly, the person can adapt to only occasional and routine workplace changes. (Tr. 103). Notably, this hypothetical does not include the use of a cane. (*See id*.).

The VE testified that this hypothetical individual could not perform Jones's past work, but that they could perform the following two jobs at the light, unskilled level: office helper, DOT 239.567-010, SVP 2, unskilled, with 101,000 jobs in the national economy; and mail clerk, DOT 209.687-026, SVP 2, unskilled, 42,000 jobs in the national economy. (Tr. 103-04). The VE testified that "those are the only two jobs at the light, unskilled level that meet RFC." (Tr. 104). Next, the ALJ questioned the VE about other light jobs:

> Q: Can you identify jobs that are light based on the amount of lifting and carrying, but that would, you know, still require no more than two hours of standing and walking and are consistent with this hypothetical?
>
> A: I would not have any jobs, Your Honor.

(Tr. 106).

The ALJ also questioned the VE about the use of a cane for ambulation:

> Q: If I was to take hypothetical one and I added to this that this individual requires the use of a cane for ambulation, what impact would that have on your answers or response that you gave me in hypothetical one?
>
> A: That would eliminate the jobs that I supplied for hypothetical one. And, in fact, *that would eliminate all jobs at the light, unskilled level.*

> Q: Okay. . . . would there be other jobs this person can perform using a cane that is consistent with hypothetical one?
>
> A: Yes. And those jobs would be at the sedentary, unskilled level. And so the jobs of the circuit board assembler and the table worker, those would still be available and the numbers would remain the same.

(Tr. 107 (emphasis added)).

This excerpted testimony shows that the light RFC with use of a cane for ambulation does not have any jobs available in the national economy, and that the jobs identified by the ALJ – office helper and mail clerk – do not provide the support of substantial evidence at Step Five of the sequential evaluation. Although the VE testified that two jobs would be available for an individual who requires the use of a cane, those jobs are the sedentary exertional jobs of circuit board assembler and table worker. This mismatch between the RFC, the jobs cited in support of the Step Five determination, and the VE's testimony does not provide the support of substantial evidence.

I now take the time to address the Commissioner's argument against remand. (ECF Doc. 8, pp. 4-5 ("Plaintiff can perform sedentary work including the jobs [of] circuit board assembler and table worker identified by the VE and remand would be nothing b[ut] a useless formality.")). With this statement, the Commissioner asks this Court to overstep its bounds to determine the RFC that Jones should have had, and to find that jobs not relied on by the ALJ are available in the national economy to ultimately decide Jones is not disabled. It is impermissible for a court to decide the facts anew or re-weigh the evidence. *Jones*, 336 F.3d at 476. Social security regulations instruct that determination of the RFC is the realm of the ALJ and is not for this Court to decide. 20 C.F.R. § 404.1546(c); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) *and Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009). And, despite the Commissioner's contention otherwise, harmless error does not apply

19

when the ALJ's findings are inconsistent with and unsupported by record evidence. *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 529 (6th Cir. 2014). At bottom, the following applies: "[i]n reviewing an ALJ's findings and conclusions, this Court shall not accept appellate counsel's post hoc rationalization for agency action in lieu of accurate reasons and findings enunciated by the Board." *Keeton*, 583 F. App'x at 524 (internal quotation and marks omitted). There is no path for me to step into the ALJ's shoes to correct this error; I must therefore recommend remand.

## VII.  Recommendation

Because the ALJ failed to reach a conclusion supported by substantial evidence, I recommend that the Commissioner's final decision denying Jones's application for disability insurance benefits be vacated and that his case be remanded for further consideration.

Dated: February 26, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the

United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entire report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

Before